\UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CON-WAY TRANSPORTATION
SERVICES, INC.,

        Plaintiff,

vs.

AUTO SPORTS UNLIMITED, INC.,

        Defendant.

_____/

Case No. 1:04-CV-570

Hon. Hugh W. Brenneman, Jr.

## OPINION

Plaintiff, Con-Way Transportation Services, Inc. ("Con-Way"), brings this diversity action pursuant to 28 U.S.C. § 1332 to collect $102,538.83 of unpaid invoices for transportation services provided to Auto Sports Unlimited, Inc. ("Auto Sports"). The parties consented to have this matter tried by the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. Rules Civ. Proc. 73. Following a four-day bench trial, post-trial briefs and supplemental post-trial were submitted. The case is ready for decision.

### Findings of Fact

Based upon the testimony and exhibits received at trial, and the record in this proceeding, the court makes the following findings of fact as required under  Fed. R. Civ. Proc. 52(a)[1]:

---

[1]  Any findings of fact which contain conclusions of law shall be considered as such.  The citations to the record below are representative and not intended to be an exhaustive recounting of all evidence in the record supporting a particular finding.

1.     Con-Way Transportation Services, Inc. is a motor carrier engaged in the transportation of goods, and is the carrier in this action.  It is one of a number of Con-Way companies.   It has gross revenues approaching $4 billion annually.  The parent company, Con-Way Freight, Inc., operates throughout the United States.  Wayne King Dep. at 7-8.[2]  Because it is a nationwide organization, various functions affecting this case were performed in different locations.  For example, Con-Way invoices were generated by an office in Oregon, payments were sent to a Con-Way office in Pittsburgh, and disputes went to a Con-Way office in Texas.

2.     Auto Sports is a corporation engaged in selling automotive parts, such as transmissions, motors and bumpers, for late model European and Japanese import cars.  Trial Trans. II at 6, PE 12.[3]  It is the shipper in this action.

3.     Between April 2001 through January 2004, Con-Way transported goods for Auto Sports in thousands of separate transactions, called shipments.  PE 2, DE 14.  Defendant shipped 150 to 250 shipments a month.  Trial Trans. II at 8.

4.     The parties entered into pricing agreements dated February 28, 2001, March 15, 2001, April 30, 2002, and August 22, 2002.  DE 2, Trial Trans. I at 63-69.  Each pricing agreement is identified as "Tariff 555 Item 15405."  DE 2.  These agreements allowed defendant a 68% discount on shipping with a

---

[2] Neither party moved to admit Wayne King's deposition transcript into evidence.  However, we was listed as a witness, Con-Way provided a copy of his deposition transcript to the court and the court reviewed portions of his deposition transcript throughout trial without objection from either party.  Accordingly, the court considers this entire deposition as part of the trial record.

[3] Plaintiff's exhibits will be identified as "PE #".  Defendant's exhibits will be identified as "DE #".

$55.00 absolute minimum for shipments within the United States. DE 2, Trial Trans. I at 63-69. The pricing agreements placed Auto Sports on a credit basis for the account with Con-Way.  Trial Trans. I at 67.

5.   In a letter dated May 20, 2004, Con-Way reduced Auto Sports' discount to 30% for most shipments.  DE 4.

6.   When Auto Sports wanted to ship an item, it would normally  fill out a bill of lading supplied by Con-Way and call Con-Way to pick up the item to be shipped.  Trial Trans. I at 69-70, 105-06, Trial Trans. II at 22-25, 105-06, Trial Trans. III at 111-13.  The terms of Con-Way's standard bill of lading applied to each shipment carried by Con-Way. Trial Trans I at 105-06, PE 3, DE 2.  The Con-Way driver assigned an invoice number to each shipment which remained for the life of the shipment.  King Dep. at 26-28.  Invoices generated by a Con-Way office in Oregon were sent to the shipper shortly after the shipment reached the central office in the local area where it was picked up.  The language of paragraphs 8 and 9 of Con-Way's straight bill of lading is found in its Tariff 199 and was drafted by Con-Way.  King Dep. at 23-26, 148-149.

7.   Auto Sports normally paid Con-Way's invoices after Con-Way's representative came to its office.  The representative visited approximately every two weeks, presented "copy bills," and reconciled them with an Auto Sports employee.  The copy bills would be left with Auto Sports to give Auto Sport's owner and president, Scott Bosgraaf, an opportunity to approve the

3

bills for payment.  Trial Trans. I at 170, Trial Trans. II at 6, 22-25, 105-06, Trial Trans. III at 111-13, PE 12. "Copy bills" contained information from the invoice, including the same invoice number listed as a "pro number," but in a different format, and had the appearance of a "typed" document rather than a "printed" document. When the Con-Way representative returned several weeks later, he would drop off new copy bills and pick up a check covering the various copy bills left during the preceding visit.  Usually, a payment was not made for a single invoice.  To the contrary, frequently one check was issued to cover from several to several hundred non-sequential invoices.  The dates of the invoices covered by a single payment usually were non-sequential as well.  This was an agreed procedure between the representatives of the companies, at least for part of this time, to get defendant's bills paid.  This was not a routine procedure with other shippers.  Trial Trans. I at 183-84. Sometimes, Con-Way would deliver a entire month's worth of invoices to Auto Sports for payment in this manner.  Trial Trans. I at 77-84.  Auto Sports sent checks directly to Con-Way during the last month or two of their business relationship.  Trial Trans. II at 25.

8.   Auto Sports was frequently delinquent in paying its account, constantly "holding checks back to get freight moving."  Trial Trans. I at 180, Trial Trans. III at 151-52.  Most companies did not pay within the requisite 15 days. Trial Trans. I at 172.

9.      By the terms of its own standard bill of lading,  Con-Way was required to issue any bill for charges in addition to those originally billed, within 180 days of the date of the original bill in order to have the right to collect such additional charges.  Paragraph 9 in both PE3 and the straight bill of lading. Nothing in paragraph 9 stated that its provisions did not apply to the removal of a discount from an invoice.  *Id.,* King Dep. At 149.  Similarly, a shipper was required to contest the original bill within 180 days of the date of the original bill in order to have the right to contest such charges. Paragraph 9 in both PE3 and the straight bill of lading.  Con-Way maintains records of persons disputing invoices and has no such record for Auto Sports.  King Dep. at 34-35.

10.      Con-Way did not keep paper copies of invoices sent to its customers.  Trial Trans. I at 28-30, King Dep. at 139-40.  The substantive information was stored electronically in an accounting program, from which a new copy of essentially the same information could be generated from the data.  *Id.*  This information was transferred electronically by Con-Way to third parties for collection.  Trial Trans. I at 28-30,  King Dep. at 144-46.

11.      Defendant's 'account' was referred to Bethune & Associates, Attorneys at Law (Bethune) in Arizona for collection on June 7, 2004.  Bethune sent Auto Sports a letter stating that it had been hired by Con-Way to collect "the full undiscounted freight charges due for transportation services performed for you" and requested "a complete audit of your transportation account and

5

freight history."  PE 2.  Although addressed to Auto Sports, the letter mistakenly stated that "Nevown, Inc." owed Con-Way $65,307.43. *Id.*

12.  Scott Bosgraaf sent a reply to this letter stating that "Conway has been <u>paid</u> <u>IN FULL</u> open Invoices are offset by open claims that precede the freight Invoices[.]  Scott B."  PE 2, Trial Trans. II at 14, Trial Trans. III at 84.

13.  On or about June 16, 2004, Bethune sent Auto Sports copies of 379 disputed invoices (sometimes referred to as the "reprinted invoices") totaling $102,538.83. PE 1, PE 5, Trial Trans. I at 28, John Brewington Dep. at 6-7. The "reprinted invoices" were prepared from electronically stored information from the original invoices.  The information was reprinted on a new invoice form which had a different format.  The reprinted invoices bore different Con-Way logos and different DUNS numbers.[4]   The reprinted invoices sought payment for services rendered between December 12, 2002 and December 23, 2003, and not paid.  PE 1. The reprinted invoices did not include the 68% discount, which was interlineated or "lined out" on each invoice.  PE 1, PE 5, Trial Trans. I at 28, Brewington Dep. at 6-7.[5]  If the discounts are not eliminated, the total amount owed according to the invoices would have been $35,658.61.  See PE 5.

---

[4]A DUNS (short for Data Universal Numbering System) number is a unique numeric identifier for a single business entity.  The system was developed by Dun & Bradstreet to identify businesses worldwide.

[5]There was no objection in the final pretrial order to the testimony of John Brewington's coming into evidence by deposition.

14.     During the course of their business relationship, Con-Way submitted other invoices to Auto Sports totaling $410,189.94. PE 1, PE 10, PE 11, DE 14, DE 18, DE 21.   These invoices involved transactions Con-Way believed was unrelated to the 379 reprinted invoices sent by Bethune.   *Id.*

15.     29 of the 379 invoices, totaling $2,614.81, had in fact been previously paid by Auto Sports.

16.     During the course of their business relationship, defendant made payments to plaintiff totaling $425,077.34.  PE 10, DE 1, DE 14.[6]

17.     Although the court has been compelled to review the parties' confused transactional history, this is not an accounting action.  Also, Con-Way does not seek to collect the penalty fee of 1.5% per month provided for in the bill of lading.

### Conclusions of Law[1]

**I.     The invoices**

As an initial matter, Auto Sports objects to PE 1, the 379 reprinted invoices, asserting that these are not the "best evidence" under Fed. R. Evid. 1002 and 1004.   The objection is not well taken.

Federal Rules of Evidence 1002 requires that to prove the content of a writing, the original writing is required except as otherwise provided by the Federal Rules of Evidence.  And

---

[6] Although not referenced in the index of the trial transcript, the court admitted DE 14 and 21 on the fourth day of trial.  Trial Trans. IV at 214.  The court notes that Mrs. Michelle DeRidder gave extensive testimony referencing these exhibits.  Trial Trans. IV at 120-214.

[1] Any conclusion of law which contains findings of fact shall be treated as such.

"original" of a writing is defined by Rule 1001(3) as the writing itself "or any counterpart intended to have the same effect by a person executing or issuing it. . . If data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an 'original'".  Con-Way seeks payment for the 379 reprinted invoices, which represent charges for services rendered in 2002 and 2003.  Con-Way readily admits that these are not the invoices originally sent to defendant, but rather reprinted invoices based upon information extracted from Con-Way's computer records, which Bethune generated with Con-Way's approval to collect the debt. Information on the original invoices sent to the defendant (and Con-Way's other customers) is routinely transferred and maintained in an electronic format due to the large volume of such information this plaintiff accumulates over time.  The reprinted invoices are representations of the contents of the original invoices, but are not produced in the precise format of the original invoices. See Findings of Fact, *supra*.  The reprinted invoices appear to fall clearly within that portion of the definition of an original which provides that if data is stored in the computer, <u>any</u> printout readable by sight and <u>shown to reflect the data accurately</u> is an original.  While Bosgraaf gave extensive testimony regarding alleged inconsistencies about certain of the reprinted invoices, he did not raise a "genuine question" as to the authenticity of the invoices or their contents, or the method for maintaining them.  Such isolated instances could arise in any accounting system.

Even if the reprinted invoices are not considered "originals", Rule 1004 provides that "[t]he original is not required, and other evidence of the contents of a writing . . . is admissible if [a]ll originals are lost or have been destroyed, unless the proponent has lost or destroyed them in bad faith; . . .".  The court is satisfied from the testimony presented that the reprinted invoices are adequate representations of the contents of the invoices mailed to the shippers, even if they are not originals

themselves.  The court finds these reprinted invoices to be satisfactory evidence of the contents of

the initial invoices, since there is no serious contention of inaccuracy or challenge as to plaintiff's

methods of maintaining its records.  There is certainly no evidence the originals were destroyed in

bad faith, and the court will not penalize Con-Way for utilizing computer technology.  Thus the

reprinted invoices are also admissible under Rule 1004(1).

II.     **The discount**

A.     **Regulation and De-Regulation of the Trucking Industry**

The parties have taken conflicting and inconsistent positions throughout this litigation

with respect to the effect of the federal statutes and regulations applicable to carriers such as plaintiff,

an issue necessary to resolve this litigation.

Plaintiff, a transportation company involved in interstate commerce, entered into a

pricing agreement with defendant.  The parties disagree as to whether the 68% discount offered by

plaintiff at time of shipment continues to apply to the 379 reprinted invoices once plaintiff referred

them to Bethune for collection.  The federal government has general jurisdiction over interstate motor

carrier transportation.  *See* 49 U.S.C. § 13501 *et seq.* (sometimes referred to as "Chapter 135").

Throughout trial, the plaintiff carrier relied on the "filed rate doctrine" as the legal basis for its claim.

The "filed rate doctrine," as set forth in *Security Services, Inc. v. Kmart*, 511 U.S. 431, 435 (1994),

provided that where a motor carrier was subject to the Interstate Commerce Act, it must publish its

rates filed with the Interstate Commerce Commission (ICC) pursuant to 49 U.S.C. §§ 10761(a) and

10762(a), and that the carrier "may not charge or receive a different compensation for that

transportation . . . than the rate specified in the tariff." *Kmart*, 511 U.S. at 435, quoting 49 U.S.C.

§ 10761(a).  The purpose of this statutory scheme was "to create strict filed rate requirements and to

9

forbid equitable defenses to collection of the filed tariff." *Kmart*, 511 U.S. at 435, *quoting Maslin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990).

The trucking industry, however, has undergone substantial deregulation since the *Kmart* decision.  In *Transit Homes of America v. Homes of Legend, Inc.*, 173 F. Supp. 2d 1185 (N.D. Ala. 2001)[2], the court set forth a brief history of the trucking industry's regulation and subsequent deregulation :

> Although such is not the case today, the trucking industry was for years subject to heavy government regulation. The court in *Munitions Carriers Conference, Inc. v. United States*, 331 U.S.App. D.C. 213, 147 F.3d 1027 (D.C.Cir.1998), presented this abstract:
>
> > Once upon a time the United States banned price competition among interstate motor carriers of freight. *See Howe v. Allied Van Lines, Inc.*, 622 F.2d 1147, 1152-54 (3rd Cir.1980) (describing institution of tariff regime for railroads in 1887 and its extension to motor carriers in 1935). Each carrier was required to file with the late Interstate Commerce Commission a tariff of its prices and conditions of carriage. *See* 49 U.S.C. § 10762(a)(1) (1994) (repealed 1995). The carrier could not charge a shipper any rate other than the rate in the filed tariff, *see* 49 U.S.C. § 10761(a) (1994) (repealed 1995), give any shipper "preferential treatment," *see* § 10735(a)(1), or discriminate "unreasonably" in its charges to similarly situated shippers, *see* § 10741(b) (1994) (repealed 1995).
>
> > \* \* \* \* \* \*
>
> > In 1995 the Congress found that motor carriage had become a "mature, highly competitive industry where competition disciplines

---

[2] The court issued two related decisions in this case.  In *Transit Homes of America v. Homes of Legend, Inc.* ("*Transit Homes I*"), 173 F. Supp. 2d 1185 (N.D. Ala. 2001), the court held that in the absence of a filed tariff, the federal court did not have original jurisdiction over a carrier's action to collect unpaid freight charges under 28 U.S.C. § 1337.  In *Transit Homes of America v. Homes of Legend, Inc.* ("*Transit Homes II*"), 173 F. Supp. 2d 1192 (N.D. Ala. 2001), the court denied the carrier's motion to reconsider, concluding that the federal statute permitting carriers and shippers to bring a breach of contract action in an appropriate state or federal court did not create a federal cause of action or confer federal jurisdiction over such suits pursuant to 28 U.S.C. § 1337.  *Transit Homes II* did not preclude diversity jurisdiction, which plaintiff has relied upon in filing the present action.  Complaint, ¶ 4.

rates far better than tariff filing and regulatory intervention," and that rate regulation was no longer necessary except for "[two] specialized categories of trucking operations." S.Rep. No. 104-176, at 10 (1995) (referring to household goods and certain noncontiguous domestic trade, hereinafter collectively "household goods"); *see id.* at 43 (noting that "for the two categories of traffic for which rates would be regulated, new [§] 13701(a) would import the basic rate reasonableness requirement"); *see also* 49 U.S.C. § 13701 (also imposing reasonableness requirement on "through routes," "divisions of joint rates," and rates "made collectively by [any group of] carriers under agreements approved" by the Surface Transportation Board). Therefore, the Congress abolished the ICC and repealed the provisions (1) requiring that a carrier file tariffs for all types of goods it transports; (2) prohibiting discrimination and preferential treatment; (3) prohibiting government requisition of reduced rate transport; and (4) permitting a carrier voluntarily to offer the Government reduced rates.

The Congress then enacted a new statutory scheme under which a carrier need file tariffs only for the transportation of household goods, as to which preferential treatment is still prohibited. *See* 49 U.S.C. ch. 137, § 13704(a)(2) (Supp. I 1995).

147 F.3d at 1028-29.

During the period that carriers were required to maintain tariffs on file with the ICC, federal jurisdiction unquestionably was present under 28 U.S.C. § 1337 in cases in which a carrier sought to recover unpaid freight charges from a shipper due under a filed tariff. *See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983). This was so, the Supreme Court explained, because " 'the Interstate Commerce Act requires carrier to collect and consignee to pay all lawful charges duly prescribed by the tariff in respect of every shipment. Their duty and obligation grow out of and depend upon that act.' " *Id.* at 534, 103 S.Ct. 1343 (quoting *Louisville & Nashville R. v. Rice*, 247 U.S. 201, 202, 38 S.Ct. 429, 62 L.Ed. 1071 (1918)). However, because the Supreme Court's decision in *Thurston* is grounded upon the theory that a carrier's right and duty to seek recovery of unpaid charges depended upon a filed tariff and the requirements of the ICA, that case has no application to a claim for unpaid freight charges where the carrier was not required to file a tariff for the transportation provided. *Henslin v. Roaasti Trucking, Inc.*, 69 F.3d 995, 998 (9th Cir.1995).

[Plaintiff] does not allege anywhere in its complaint that it is seeking to recover amounts due under a filed tariff. Indeed, [Plaintiff] concedes that at no time relevant to this action did the ICA require it to file a tariff with the Surface

Transportation Board ("STB"), the successor to the ICC. [Plaintiff] does not suggest that it has filed a tariff, and even if it had, the tariff would be of no legal effect. *See* 49 U.S.C. § 13710(a)(4); *Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030 (7th Cir.2000). Thus, it is apparent that [Plaintiff]'s right to recover unpaid freight charges is not founded upon any federally required tariff . . .

*Transit Homes I*, 173 F.Supp.2d at 1189-90 (footnote omitted).[3]

*Transit Homes I* is applicable here, and plaintiff's "Tariff 199" or "Tariff CNWY-199" (PE 3, 4) is the type of document described as a nullity in that case insofar as it purports to be an actual tariff. While plaintiff refers to it as a "tariff," it has no legal effect other than as a statement of plaintiff's standard contractual terms. The ICC Termination Act of 1995 "abolished the tariff filing requirement and the filed-rate doctrine, and it canceled the legal effectiveness of most extant tariffs." *Tempel Steel*, 211 F. 3d at 1030.   *See* 49 U.S.C. § 13702 (limiting the tariff filing requirements to noncontiguous domestic trade and household goods carriers); 49 U.S.C. § 13710(a)(4) ("[a]ny tariff on file with the Interstate Commerce Commission on August 26, 1994, and not required to be filed after that date is null and void beginning on that date.  Any tariff on file with the Interstate Commerce Commission on January 1, 1996, and not required to be filed after that date, is null and void beginning on that date.").

"Today carriers adopt standard contractual terms, which some call 'tariffs' out of habit, but which have no effect apart from their status as contracts." *Tempel Steel*, 211 F.3d at 1030. "Since tariffs no longer need to be filed with a government agency, they have no effect apart from their status as a carrier's standard contractual term." *Hillenbrand Industries Inc. v. Con-Way Transportation Services Inc., d/b/a Con-Way Central Express*, No. NA 00-0255-C-BS, 2002 WL

---

[3]This informative passage was quoted in is entirety by the court in *Central Transport Intern. v. Sterling Seating, Inc.*,  356 F.Supp.2d 786, 789-790 (E.D. Mich. 2005).

1461687 at *4 (S.D. Ind. June 19, 2002). Thus, plaintiff's Tariff 199 is nothing more, or less, than plaintiff's standard contractual terms.

The parties in this action entered into pricing agreements for the transportation of goods as authorized by 49 U.S.C. § 14101, which provides in pertinent part:

> (b) Contracts with shippers.--
>
> (1) In general.--A carrier providing transportation or service subject to jurisdiction under chapter 135 may enter into a contract with a shipper, other than for the movement of household goods described in section 13102(10)(A), to provide specified services under specified rates and conditions. If the shipper and carrier, in writing, expressly waive any or all rights and remedies under this part for the transportation covered by the contract, the transportation provided under the contract shall not be subject to the waived rights and remedies and may not be subsequently challenged on the ground that it violates the waived rights and remedies. The parties may not waive the provisions governing registration, insurance, or safety fitness.
>
> (2) Remedy for breach of contract.--The exclusive remedy for any alleged breach of a contract entered into under this subsection shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree.

49 U.S.C. § 14101.

Under the post-deregulation statutory scheme, federal courts have concluded that a carrier's suit to collect unpaid charges for freight transportation services is a state law contract action under a shipping contract authorized by 49 U.S.C. § 14101(b) rather than a federal action under a filed tariff pursuant to 49 U.S.C. § 13702. *Central Transport International v. Sterling Seating, Inc.*, 356 F. Supp. 2d 786, 791 (E.D. Mich. 2005) (transport company's claim arising from a contract for motor services, rather than a filed tariff, is a state law contract dispute); *Mastercraft Interiors, Ltd. v. ABF Freight Systems, Inc.*, 350 F. Supp. 2d 686, 692 (D. Md. 2004) ("contracts between carriers and shippers under § 14101(b)(1) are governed by state law"); *Transit Homes I*, 173 F. Supp. 2d at

13

1191 (where there is no applicable tariff, the filed rate doctrine has no application, and no reason that federal law creates an obligation for carriers to collect particular rates; rather, a carrier's "right . . . to recover unpaid charges arises solely out of the terms of its agreed upon contract with [the shipper]").  Accordingly, the court will review plaintiff's claim as a state law contract action governed by the terms agreed to by the parties.

### B.      The Bill of Lading

As a state law contract action, this action is controlled by Michigan law.  "A federal court sitting in diversity applies the substantive law of the state in which it sits." *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001).  Auto Sports, a Michigan corporation, maintains its offices in Michigan, and executed bills of lading primarily at that location.  Neither party contends that any law, other than Michigan law, would apply to these transactions which arose in Michigan.

Michigan law provides that  "[a] bill of lading is both a receipt for goods by a carrier, and a contract to carry."  *Wettlaufer Mfg. Corporation v. Detroit Bank*, 324 Mich. 684, 689, 37 N.W.2d 674 (1949). *See generally, Southern Pacific Transp. v. Commercial Metals*, 456 U.S. 1815, 1820 (1982) ("[t]he bill of lading is the basic transportation contract between the shipper-consignor and the carrier").  The court looks to the bill of lading for the contract terms applicable to the transactions at issue in this suit.

Under the parties' pricing agreements, each shipment by a Con-Way driver is subject to the terms as set forth in Con-Way's standard bill of lading, which provides in pertinent part:

8)        All payments due hereunder shall be made within 15 calendar days of the date of invoice.  Payment of charges not received within 15 calendar days of the date of invoice, or within a time period agreed to by the parties in writing, will be considered a late payment.  Late payments shall be subject to a charge of 1.5% per month added to all outstanding balances when either of the following conditions occur:

    A.         When Carrier has notified debtor of the assignment or intent to assign the freight bill(s) to a professional service for collection, or to file a claim in a court of law for collection;

    B.         When Carrier has advised debtor in writing of intent to apply the penalty fee of 1.5 percent per month.

In addition, upon any of the aforementioned conditions occurring, any and all allowances, exceptions, commodity rates and other provisions which result in total charges due the Carrier of less than the non-discounted charges due from Tariff CNWY-599 class rates in effect on the date of the shipment, shall be discontinued and no longer apply.

9)    Carrier must issue any bill for charges in addition to those originally billed within 180 days of the date of the original bill in order to have the right to collect such additional charges. Shipper must contest the original bill within 180 days of the date of the original bill in order to have the right to contest such charges. Shipper shall not have the right to withhold or offset the payment of charges for any reason, including, but not limited to, claims for lost or damaged goods.

PE 2, PE 9A. The parties agree that paragraph 8 is a prerequisite to removal of the discount. The court finds that the trigger conditions in paragraph 8 (i.e. subparagraphs A and B) must occur within the period set out in paragraph 9.

## 1.    Notice of Assignment of Freight Bills

The bill of lading provides that non-discounted charges "shall be discontinued and no longer apply"when the "Carrier has notified debtor of the assignment or intent to assign the freight bill(s) to a professional service for collection, or to file a claim in a court of law for collection." PE 2, PE 9A. Wayne King, a Con-Way credit and collections manager from Texas, explained in his testimony that "[t]he discount is not removed until we -- until we notify the customer we've placed the account with a third party." King Dep. at 5, 148. Con-Way contends that the June 7, 2004 letter from Bethune established the "notice" sufficient to revoke the discount.

The court disagrees.  Bethune's letter demanding payment was not notification by the "carrier" of the assignment to a professional collection service as required under express terms of the bill of lading. PE 9A.   There is no evidence that Bethune is the "carrier," i.e., a part of the Con-Way organization.  Bethune is a separate third-party professional collection service charged with collecting defendant's delinquent account.   Under the plain language of the contract, Bethune is not the "carrier," but rather the "professional service for collection."  Accordingly, Bethune's June 7, 2004 letter to defendant is not the notice <u>from the carrier</u> "of the assignment or intent to assign the freight bill(s) to a professional service for collection" sufficient to revoke the discount.  Con-Way skipped the customer notification step and proceeded directly to its third-party collection efforts.  Under these circumstances, the court concludes that Con-Way failed to take a step necessary to remove the discount.

### 2.        180-Day Notification Period

In addition, Con-Way did not comply with the 180-day  requirement with respect to billing additional charges.  PE 9A.  The amount that was "originally billed" was unquestionably the discounted amount, which was set out on the invoices in large bold print opposite the words "TOTAL DUE", in equally large bold print.  While there was mention of the amount the discount was saving the customer printed in a much smaller font in the section of the invoice headed "Description of Articles and Marks," this was clearly only part of an explanatory statement showing how the amount being billed had been calculated.  It was not the amount being billed.

And on the payment stub, which was the lower third of the invoice, the discounted amount and the words TOTAL DUE were again set out in large bold font, with no mention whatsoever of the non-discounted amount.  It was this payment stub which was to be returned to the

Con-Way payment collection point in Pittsburgh, along with the customer's check.  The people in Pittsburgh would then see what the amount billed was (the "TOTAL DUE") and that it had been paid.

It would be unrealistic to construe the transaction any other way.  First, the "discount" was so substantial that it was evident that the discounted amount was the amount the parties expected the payment to be paid and, thus, the amount they were actually contracting for.  A charge without the discount was approximately three times the discounted figure.

Second, under the terms of the bill of lading and the parties' pricing agreement, Con-Way had no right to collect the non-discounted amount when it issued the original invoices, so it could not bill the shipper for it on the original invoice.  In fact, the discount did not even expire of its own accord; rather one of several substantial affirmative steps had to be taken by Con-Way before the billed amount changed, and the higher amount was imposed.  See Bill of Lading.

Third, paragraph 9 clearly provides a deadline of repose for both parties.  After six months, each side knew it would not have to worry about having to pay any additional charges (the shipper) or deal with any further disputes over the charges (the carrier).  It is not surprising that the parties would desire repose in the billing, since most of the bills amounted to less than $100, and only deserved limited attention.

Finally, there is nothing in the text of paragraph 9  indicating that increases resulting from the imposition of the undiscounted amounts were somehow exempted from its provision pertaining to additional charges.

The court finds the additional amounts subsequently billed by Con-Way following its discontinuance or revocation of the 68% discount, to be a charge "in addition to those originally billed."  PE 9A.  Interestingly, even plaintiff's counsel refers to the undiscounted amounts as

"collection charges" or "liquidated damages," *see* Plaintiff's Supplemental Trial Brief at 3-5, which by anyone's understanding would be considered "charges in addition to those originally billed". In light of all of the above, this is the only reasonable way to construe paragraph 9.   The reprinted invoices were in a different format from the original invoices and demanded the larger non-discounted payments from defendant. From both parties' perspective, the reprinted invoices included additional charges which had not been demanded as being due in the original invoices.[4]

The court concludes that Con-Way was required to timely bill the additional charges within 180 days if it wished to collect the increased amounts. It failed to do so. Therefore, Auto Sports is entitled to the 68% discount with respect to the 379 re-printed invoices, which results in a liability of $35,658.62 rather than the un-discounted figure. PE 5.

### III.    The amount owed to plaintiff

Finally, the court must determine whether plaintiff has been paid the amount owed on the 379 outstanding invoices. After an exhaustive review of the evidence presented by the parties, it is impossible for this court to match each of Con-Way's invoices with a corresponding check from Auto Sports. For example, frequently one check paid for dozens, even hundreds, of non-sequential invoices with non-sequential dates. A majority of the shipment invoices were for less than $100.00,

---

[4] Even assuming, *arguendo,* that Con-Way had made a persuasive showing that paragraph 9 might also be read to say that non-discounted charges were not additional charges within the meaning of that paragraph, Con-Way would simply be pointing out an ambiguity in the language of the documents that it drafted.   "We give contractual language its plain and ordinary meaning, avoiding technical and constrained constructions." *English v. Blue Cross Blue Shield of Michigan,* 263 Mich. App. 449, 471, 688 N.W. 2d 523 (2004).   "A contract is ambiguous when its words may be reasonably understood in different ways.   If an ambiguous term exists in the contract, courts should generally construe the term against the contractor's drafter, unless the drafter presents persuasive extrinsic evidence that the parties intended a contrary result." *Cole v. Auto-Owners Ins. Co.,* 272 Mich. App. 50, 53, 723 N.W.2d 922 (2006) (internal citations omitted). The drafter has made no such showing.

while a check might be for $10,000.00 to $14,000.00.  The amount credited against a particular invoice was not always the amount of the invoice.

The court is not alone in this dilemma.  Con-Way apparently had a similar problem, as indicated by Bethune's letter, which requested from the debtor "a complete audit" of Auto Sports' "transportation account and freight history."  Normally this is something the creditors can readily produce.

Under the circumstances, it is necessary for the court to review the entire history of the parties' transactions, both the invoices purportedly paid and those purportedly not paid, to determine the amount owed to Con-Way by Auto Sports.  The court relies, in part, on the Invoice/Payment Analysis (sometimes referred to as the "expert's analysis") prepared by the accounting expert to bring some organization to these transactions.  DE 14.[5]  The expert's analysis, based upon those records the parties were able to produce, contains a fairly comprehensive history of Con-Way's invoices sent to Auto Sports, and Auto Sports' payments sent to Con-Way.  While the expert's analysis points out a number of questions regarding plaintiff's application of payments received from defendant,[6] it nevertheless establishes an indispensable framework for resolving the present dispute.

Based upon the parties' records, as of August 31, 2005 Con-Way had submitted $410,189.94 of "uncontested" invoices to defendant, but received payments from defendant in the amount of $425,077.34. PE 10, DE 1, DE 14.  "Uncontested" refers to the fact plaintiff is not seeking to collect these invoices.  As far as Con-Way is concerned these amounts have been paid.  "Contested

---

[5] *See* Order appointing expert (June 10, 2005).

[6] *See* "Tickmark Legend." DE 21.

invoices" are the ones giving rise to this action; they are the invoices Con-Way claims were not paid. It appears from the expert's exhibits that Con-Way received an overpayment of $14,887.40 on these "uncontested" invoices.  The court has reviewed the expert's exhibits and agrees.  At the end of the day, these several thousand transactions which comprise the "uncontested" invoices result in a $14,887.40 credit for Auto Sports against its unpaid bills owing to Con-Way.

Upon reviewing the evidence, one instance of "double counting" needs mention.  The court finds that 29 of the so-called 379 "contested" or unpaid invoices were also listed among Con-Way's "uncontested" invoices.[7]   These 29 invoices total $2,614.81.  The audit reconciled the amounts owed and payments made on these 29 invoices in determining that defendant overpaid the "uncontested" invoices.  Con-Way cannot collect the amounts owed on these 29 invoices a second time.  For this reason, Con-Way's discounted claim of $35,658.61 will be reduced by $2,614.81, the amount of these 29 invoices.  This adjustment results in "contested" unpaid discounted invoices totaling $33,043.80.  After crediting defendant's overpayment of $14,887.40, the court finds that defendant owes Con-Way $18,156.40.

---

[7] *See* Invoice Nos. 453-470124, 255-214400, 255-213545, 267-189996, 255-380425, 255-275031, 255-278295, 287-150135, 236-539925, 381-383763, 385-320-191, 216-520931, 296-414123, 255-435751, 250-984005, 255-458184, 255-444803, 255-442283, 399-248695 [identified by defendant as 399-248965], 412-509123, 255-440920, 255-440931, 255-440916, 851-827266, 851-846166, 851-853542, 851-858685, 851-872630, and 851-862782.

## **Conclusion**

Con-Way is entitled to a judgment in its favor, and against defendant, in the amount of **$18,156.40.**  A Judgment consistent with these Findings of Fact and Conclusions of Law shall be entered forthwith.


Dated:  September 28, 2007                             /s/ Hugh W. Brenneman, Jr.
                                                       HUGH W. BRENNEMAN, JR.
                                                       United States Magistrate Judge